# United States District Court
## for the Northern District of Oklahoma

---

Case No. 24-cv-42-JDR-JFJ

---

DARRION PACK,

*Plaintiff,*

*versus*

JEREMIAH JIM, *in his individual capacity*; JESSICA KELLY, *in her individual capacity*; DARRIN VARNELL, *in his individual capacity*; *and* SHAWN PRICE, *Pawnee County Sheriff, in his official capacity,*

*Defendants.*

---

## OPINION AND ORDER

---

Plaintiff Darrion Pack alleges a detention officer sexually assaulted her while she was detained at the Pawnee County Jail in Pawnee, Oklahoma. She seeks relief under 42 U.S.C. § 1983, asserting the following federal claims: (1) a Fourteenth Amendment deliberate indifference claim against current Pawnee County Sheriff Shawn Price, in his official capacity, under a theory of municipal liability; (2) a Fourteenth Amendment deliberate indifference claim against former Pawnee County Sheriff Darrin Varnell, in his individual capacity, under a theory of supervisory liability; and (3) a Fourteenth Amendment deliberate indifference claim against Pawnee County Jail Administrator Jessica Kelly, in her individual capacity, under a theory of supervisory liability;[1] and (4) a Fourteenth Amendment deliberate indifference claim against

---

[1] Ms. Pack's First Amended Complaint identifies Ms. Kelly as the person who served as the jail administrator. Dkt. 22 ¶ 6. As discussed below, undisputed facts in the summary-judgment record show that no person named Jessica Kelly worked as the jail administrator at the time relevant to Ms. Pack's claims.

No. 24-cv-42

former Pawnee County Detention Officer Jeremiah Jim, in his individual capacity, based on his personal participation in the alleged assaults. Dkt. 22 ¶¶ 3, 12, 15-31;[2] *see also* Dkts. 46, 48.[3] Ms. Pack also asserts the following state-law claims: (1) a common law negligence claim against Ms. Kelly; (2) a common law negligence claim against Mr. Jim; and (3) a per se negligence claim against Mr. Jim based on his alleged violation of Okla. Stat. tit. 21, § 1114. Dkt. 22 ¶¶ 32-38.[4]

Mr. Jim, Mr. Varnell, and Sheriff Price (collectively, "Movants"), move for summary judgment under Federal Rule of Civil Procedure 56(a) asserting, in part, that they are entitled to judgment as a matter of law on Ms. Pack's federal claims because she did not exhaust available administrative remedies before filing suit as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). Dkt. 81 at 29-30; Dkt. 82 at 21; Dkt. 84 at 17-26. Mr. Jim further asserts that he is entitled to judgment as a matter of law on Ms.

---

[2] The Court's citations refer to the CM/ECF pagination. For clarity, the Court includes in brackets more precise citations when referring to affidavits, declarations, and deposition transcripts. All unpublished decisions herein are cited as persuasive authority. Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

[3] Ms. Pack describes her federal claims as arising under the Fourth, Eighth, and Fourteenth Amendments. Dkt. 22 ¶¶ 3, 15-31. At the motion to dismiss stage, the Court noted that a deliberate indifference claim based on sexual assault is treated like an excessive force claim, that the Fourth Amendment did not apply under the facts alleged, and that it would treat the claims as arising under the Eighth Amendment based on Ms. Pack's allegation that she was "incarcerated" at the Pawnee County Jail when Mr. Jim sexually assaulted her. Dkt. 46 at 13 n.8. Because the summary-judgment record shows that she instead was a pretrial detainee, her claims are governed by the Fourteenth Amendment. *Brown v. Flowers*, 974 F.3d 1178, 1182-83 (10th Cir. 2020); *Porro v. Barnes*, 624 F.3d 1322, 1325-26 (10th Cir. 2010).

[4] This Court previously dismissed the common law negligence claim Ms. Pack asserted against Mr. Varnell, finding he was immune from suit under the GTCA. Dkt. 46 at 18-19. Thereafter, this Court granted Mr. Varnell's unopposed motion to substitute Sheriff Price in his place on the Fourteenth Amendment deliberate indifference claim Ms. Pack asserted against Mr. Varnell in his official capacity. Dkts. 47, 48. Ms. Pack did not seek leave to amend her First Amended Complaint to add any state-law claims against Sheriff Price. Thus, her only remaining state-law claims are those asserted against Ms. Kelly and Mr. Jim.

No. 24-cv-42

Pack's state-law claims because it is undisputed that she did not comply with the notice requirements of Oklahoma's Governmental Tort Claims Act, Okla. Stat. tit. 51, § 151 *et. seq.*, and did not exhaust administrative remedies as required by Okla. Stat. tit. 57, §§ 564, 566, and 566.5. Dkt. 84 at 26-30. Ms. Pack responded in opposition to each motion [Dkts. 88, 89, and 90] and Movants replied [Dkts. 91, 93, and 94].

## I

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those facts that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a "dispute about a material fact is 'genuine' when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A judge considering a summary judgment motion does not "weigh the evidence and determine the truth of the matter." *Id.* at 249. Rather, the judge "determine[s] whether there is a genuine issue for trial." *Id.* And "[i]n making that determination, a court must view the evidence 'in the light most favorable to the opposing party.'" *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). But "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249.

"Failure to exhaust under the PLRA is an affirmative defense." *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011). And "[a] defendant may use a motion for summary judgment to test an affirmative defense which entitles that party to a judgment as a matter of law." *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997). In this situation, the typical summary-judgment burdens apply. If the movant meets his or her initial burden to show "that no disputed material fact exists regarding the affirmative defense asserted," then the nonmoving party must "demonstrate with specificity the existence of a disputed

3

material fact." *Id.* And "[i]f the plaintiff fails to make such a showing, the affirmative defense bars [the] claim, and the defendant is then entitled to summary judgment as a matter of law." *Id.*

## II

The following material facts are uncontroverted, deemed admitted,[5] or, if disputed, resolved in Ms. Pack's favor for purposes of summary judgment.

## A

On January 4, 2023, law enforcement officers with the Cleveland Police Department arrested Ms. Pack after she attempted to elude them and admitted to them that she had an outstanding Tulsa County felony warrant. Dkt. 84-2 at 16-17; Dkt. 84-3. Ms. Pack was booked into the Pawnee County Jail and detained there between January 4, 2023, and February 28, 2023. Dkt. 81-7 at 1-3.

During that time, Mr. Varnell was the sheriff; Nick Mahoney was the undersheriff; Kelly Trammel was the jail administrator; and Mr. Jim was a detention officer. Dkt. 81-2 at 1 [Mahoney Decl. ¶ 4]; Dkt. 81-4 at 3, 5 [Jim Dep. 14:11-16, 26:1-10]; Dkt. 81-5 at 1 [Jim Decl. ¶ 3]; Dkt. 82-1 at 14 [Varnell Dep. 36:1-2]; Dkt. 82-3 at 1 [Varnell Aff. ¶¶ 2, 3].

Mr. Jim was aware that the Pawnee County Jail, under Mr. Varnell's administration, had policies against detention officers providing contraband to and engaging in sexual conduct with inmates. Dkt. 81-5 at 2 [Jim Decl. ¶¶

---

[5] Several facts are deemed admitted because Ms. Pack's responses did not address Movants' assertions of facts in accordance with the procedures in Rule 56(c) and LCvR56-1(c). *See* Fed. R. Civ. P. 56(e)(2) (permitting court to consider a fact undisputed for purposes of summary judgment when the nonmoving party does not address the moving party's fact in accordance with procedures in Rule 56(c)); LCvR56-1(c) ("All material facts set forth in the statement of the material facts of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of material fact of the opposing party, using the procedures set forth in this rule.").

No. 24-cv-42

5, 8-9]. Mr. Jim typically worked the 3:00 p.m. to 11:00 p.m. shift; worked all shifts with at least one other jailer; did not work with any family members; was not related to any jail administrators; and did not work for any jail administrator named Jessica Kelly. Dkt. 81-4 at 4-11 [Jim Dep. 25:1-26:25, 30:25-31:5, 31:21-32:7, 38:2-19, 41:12-42:16].

When Ms. Pack first arrived at the Pawnee County Jail, she was placed in a holding cell for observation and to detox from drugs she ingested the day before her arrest. Dkt. 81-6 at 4-6, 42 [D. Pack Dep. 19:4-12, 22:10-24, 23:17-21, 85:20-24]. While in the holding cell, Ms. Pack "said something" to "Jessica" about Mr. Jim "being weird" because he "would stand over [her] and look weirdly at [her], and it made her uncomfortable." *Id.* at 39 [D. Pack Dep. 76:11-25]. Mr. Jim never touched Ms. Pack while she was in the holding cell. Dkt. 84-1 at 13 [D. Pack Dep. 88:8-19].

After Ms. Pack was moved from the holding cell to the pod housing female inmates, she and Mr. Jim began exchanging handwritten notes. Dkt. 81-6 at 11-14, 22-23 [D. Pack Dep. 32:3-33:9, 34:9-35:14, 44:6-45:11]; *see* Dkt. 81-8 (notes from Mr. Jim to Ms. Pack). Mr. Jim's notes to Ms. Pack expressed his "love" for her and his desire for a relationship. Dkt. 81-8. Ms. Pack responded by calling Mr. Jim "handsome," may have told him that she loved him, and may have expressed interest in a relationship because she "liked the attention that he was giving [her]." Dkt. 81-6 at 17-19 [D. Pack Dep. 38:12-40:16]. At least two of the notes she received from Mr. Jim discussed his actions of supplying Ms. Pack with marijuana edibles and e-cigarettes, the latter of which Ms. Pack requested after he began delivering her a marijuana edible each day with her dinner tray. *Id.* at 9-11, 14 [D. Pack Dep. 29:6-22, 31:5-32:16, 35:2-14]; Dkt. 81-8.

Between February 8 and February 21, 2023, Mr. Jim sexually assaulted Ms. Pack on two separate occasions: once by grabbing her hand and placing her fingers on his penis through a hole in his pants while he was handing out

5

No. 24-cv-42

personal hygiene items to inmates in a common area of the jail and once by approaching Ms. Pack while she was in the shower, placing his mouth on her breast, turning her around, bending her over and pushing her against the wall, and penetrating her vagina with his penis. Dkt. 81-6 at 8, 24-27, 29-34 [D. Pack Dep. 28:12-23, 49:1-52:25, 58:3-66:20].[6] Ms. Pack also testified that Mr. Jim did not threaten, forcibly hit, scratch, shove, or exhibit violence toward her while she was detained at the jail. *Id.* at 55 [D. Pack Dep. 124:2-12].

Mr. Jim voluntarily resigned from his employment as a detention officer on February 23, 2023. Dkt. 81-3 at 16.[7] Five days later, Ms. Pack was released from the Pawnee County Jail and transferred to the Tulsa County Jail. Dkt. 81-7 at 1-3.

---

[6] When asked about whether he knew Ms. Pack or had any interactions with her at the Pawnee County Jail, sexual or otherwise, Mr. Jim invoked the Fifth Amendment. Dkt. 88-1 at 2, 17, 20, 22, 25-26, 32-33, 35-37 [Jim Dep. 11:10-14, 45:18-21, 48:12-24, 50:1-20, 53:23-54:5, 60:7-61:4, 61:10-20, 63:5-66:1, 66:9-13]. For purposes of summary judgment, Ms. Pack's descriptions of the two sexual encounters with Mr. Jim as sexual assaults are therefore undisputed. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."); *Mid-Am.'s Process Serv. v. Ellison*, 767 F.2d 684, 686 (10th Cir. 1985) (noting that litigants "unquestionably may assert a Fifth Amendment privilege in [a] civil case and refuse to reveal information properly subject to the privilege [. . .] in which event they may have to accept certain bad consequences that flow from that action" (alterations added; internal citation omitted)).

[7] Mr. Varnell rehired Mr. Jim on March 9, 2023, and terminated him on April 19, 2023, after Ms. Trammel told Mr. Varnell that she received a phone call about an allegation that Mr. Jim had "engaged in inappropriate sexual conduct with [Ms. Pack]." Dkt. 82-3 at 1, 4 [Varnell Aff. ¶¶ 3, 24, 29]; Dkt. 82-1 at 14 [Varnell Dep. 36:1-13]. Upon firing Mr. Jim, Mr. Varnell asked the Oklahoma State Bureau of Investigation ("OSBI") to investigate the allegations against Mr. Jim. Dkt. 82-3 at 4 [Varnell Aff. ¶¶ 25, 29]; *see* Dkt. 82-7 (Varnell email requesting OSBI investigation). When interviewed by an OSBI agent, Ms. Pack told the agent that Mr. Jim "was a really bad person" "that he shouldn't be [at the jail]," and that "he was very unprofessional," but did not disclose that Mr. Jim had sexual intercourse with her because she "was uncomfortable talking to the male" OSBI agent. Dkt. 84-1 at 18-19 [D. Pack Dep. 97:8-98:12].

No. 24-cv-42

B

In January and February 2023, the Pawnee County Jail had a grievance system and provided inmates multiple ways to submit grievances. Dkt. 84-7 at 1-4 [Mahoney Decl. ¶¶ 4-6, 8-12]. Each pod at the jail was equipped with a computer-based kiosk system through which inmates could submit grievances about staff members, jail administrators, or other inmates and could submit "requests for staff" to request personal items or request a meeting with a particular jail supervisor or administrator. *Id.* at 2-3 [Mahoney Decl. ¶¶ 9a-9f].

When an inmate was booked into the jail, the inmate was given a PIN number that was "auto-assigned" by the kiosk system and the inmate was "educated as to how the kiosk system functioned." *Id.* at 3 [Mahoney Decl. ¶ 9e]. To use the kiosk system, an inmate was required to input the assigned PIN number and select an option from the main screen. *Id.* [Mahoney Decl. ¶ 9e]. Available options included submitting a grievance, a PREA complaint, or a request for staff. *Id.* [Mahoney Decl. ¶¶ 9e, 9f]. An inmate submitting a grievance could select who would receive the grievance and could limit the recipients to one or more jail administration members. *Id.* at 2 [Mahoney Decl. ¶ 9c]. For example, an inmate could submit a grievance only to the sheriff or only to the PREA complaint center. *Id.* An inmate submitting a grievance was required to select the category of grievance. *Id.* [Mahoney Decl. ¶ 9d.] "Each category was pre-sorted by the kiosk software into a level system corresponding with who would receive the grievance based on its seriousness." *Id.* "Certain categories, such as complaints about sexual assault or PREA violations, were automatically designated only to be sent to jail administration and would bypass lower-level jail staff, such as detention officers." *Id.* at 2-3 [Mahoney Decl. ¶ 9d]. If an inmate selected the category designated as "other," the grievance would be submitted to jail supervisors and the jail administrator. *Id.* at 3 [Mahoney Decl. ¶ 9d]. As a detention officer, Mr. Jim would not have had access to kiosk-based complaints that were categorically

7

No. 24-cv-42

reserved for viewing only by jail supervisors or administrators. *Id.* at 4 [Mahoney Decl. ¶ 14]. Requests for staff submitted through the kiosk system were received by all staff members. *Id.* at 3 [Mahoney Decl. ¶ 9f]. Inmates using the kiosk to report a sexual assault could not do so anonymously. Dkt. 88-3 at 10-11 [Varnell Dep. 32:16-33:3].

Aside from using the computer-based kiosk system, an inmate could: (1) submit a handwritten grievance or complaint to any staff member, a jail nurse, or a jail supervisor or administrator; (2) submit a verbal or handwritten request for staff to request personal items or request a meeting with a particular member of the staff or a jail administrator; or (3) speak directly with Mr. Varnell when he made weekly rounds to "see if [inmates] had any complaints." Dkt. 84-7 at 3-4 [Mahoney Decl. ¶¶ 10a, 10b, 10c]; Dkt. 81-1 at 12-13 [Varnell Dep. 27:18-28:1]. Inmates reporting a sexual assault "directly to a staff member" could not do so anonymously. Dkt. 88-3 at 11 [Varnell Dep. 33:4-18].

According to Mr. Mahoney and Mr. Varnell, an inmate also had options to direct complaints to individuals and agencies outside the jail. An inmate could submit a handwritten complaint or letter externally outside the jail, up to and including reporting any complaints to the Pawnee County District Attorney's office or could call a PREA hotline—an unlimited use, toll-free number that would connect the inmate to an outside agency for complaints about sexual abuse. Dkt. 84-7 at 4 [Mahoney Decl. ¶ 11]; Dkt. 84-8 at 2 [Varnell Dep. 32:6-15]; Dkt. 82-1 at 9-10 [Varnell Dep. 21:18-25]. When inmates were booked into jail, Mr. Varnell did not hand out PREA materials to them and did not expressly notify them that signs discussing PREA and displaying the PREA toll-free number were posted on the walls in each pod. Dkt. 88-3 at 8-10 [Varnell Dep. 30:20-32:15].

8

No. 24-cv-42

## C

Ms. Pack was aware of the computer-based kiosk system and knew she could use that system to make a canteen order, check her inmate account balance, request medical care, or submit grievances to complain about jail staff, jail administration, other inmates, or conditions in the jail. Dkt. 88-2 at 2 [D. Pack Dep. 117:8-118:9]. Ms. Pack once used the kiosk system to request and obtain medical care. *Id.* at 4 [D. Pack Dep. 119:7-20].

While detained at the Pawnee County Jail, Ms. Pack did not submit any grievances or complaints—through the kiosk system or any other means—to report to any Pawnee County Jail staff, nurse, supervisor, administrator, or sheriff, that Mr. Jim twice sexually assaulted her. Dkt. 81-6 at 28 [D. Pack Depo. 54:13-15]; Dkt. 84-1 at 8-9, 13, 27 [D. Pack Dep. 66:14-67:9, 88:16-25, 119:21-24]; Dkt. 84-7 [Mahoney Decl. ¶ 15].

## D

Appearing pro se, Ms. Pack commenced this civil action in December 2023, while she was detained at the Noble County Jail in Perry, Oklahoma. Dkt. 1 at 1, 4; Dkt. 84-1 at 15-17 [D. Pack Dep. 90:6-15, 91:16-19, 92:6-23]; Dkt. 84-13. Through counsel, she filed a First Amended Complaint in August 2024, while she was incarcerated at the Eddie Warrior Correctional Center. Dkt. 22; Dkt. 84-13.

Meanwhile, in April 2024, Ms. Pack's counsel mailed a "Governmental Tort Claim Notice" to the Pawnee County Board of County Commissioners and Mr. Varnell. Dkt. 84-17. Ms. Pack stated in her Notice that she was providing "notice of [her] claim for violations of her civil rights as a prisoner" while "an inmate in the Pawnee County Jail" and her potential claims for "violations of other Oklahoma Statutes," and demanded monetary damages. *Id.* The Notice does not identify the date, time, or circumstances surrounding her claim. *Id.*

No. 24-cv-42

## III

Movants assert they are entitled to judgment as a matter of law on Ms. Pack's federal claims based on the affirmative defense that Ms. Pack did not comply with the PLRA's exhaustion requirement. Dkt. 81 at 29-30; Dkt. 82 at 21; Dkt. 84 at 17-26. The Court agrees.

## A

The PLRA "requires prisoners with complaints about prison conditions to exhaust available grievance procedures before bringing suit in federal court." *Perttu v. Richards*, 605 U.S. 460, 464 (2025); *see* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."). For purposes of § 1997e, a "prisoner" is "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). And "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "[T]o properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules.'" *Jones*, 549 U.S. at 218 (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). The applicable procedural rules "are defined not by the PLRA, but by the prison grievance process itself." *Id.* Thus, "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.*

10

No. 24-cv-42

But despite the "mandatory nature of its exhaustion regime," which precludes judicially created exceptions for "special circumstances," the "PLRA contains its own, textual exception to mandatory exhaustion." *Ross v. Blake*, 578 U.S. 632, 640-42 (2016). Section 1997e(a) plainly provides that prisoners must exhaust "available" administrative remedies; conversely, they "need not exhaust unavailable ones." *Id.* at 642. This means "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)); *see Booth*, 532 U.S. at 734, 741 (considering "whether an inmate seeking only money damages must complete a prison administrative process that could provide some sort of relief on the complaint stated, but no money" and concluding "that Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures").

*Ross* recognized "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 643. First, when an administrative procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, when "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use," i.e., when "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* at 643-44. Third, "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644. These circumstances show that administrative remedies are unavailable and thus need not be exhausted. Absent these circumstances, however, the default rule applies: "If administrative remedies are available, the prisoner must exhaust them." *Torres v. Corr. Corp. of Am.*, 372 F. Supp. 2d 1258, 1262 (N.D. Okla. 2005) (cleaned up).

No. 24-cv-42

B

To determine whether Movants are entitled to summary judgment on the affirmative defense of PLRA exhaustion, the Court considers three questions that arise from the parties' arguments: *First*, whether the PLRA applies to Ms. Pack; *Second*, if so, whether administrative remedies were available to Ms. Pack; and *Third*, if so, whether Ms. Pack properly exhausted her federal claims.[8] None of these questions presents a genuine issue for trial.

1

First, the PLRA applies. Ms. Pack admits that she was detained at the Noble County Jail when she filed her original complaint and that she was incarcerated at the Eddie Warrior Correctional Center when she filed her First Amended Complaint. And in both complaints, Ms. Pack premises her federal claims on Mr. Jim's alleged actions of sexually assaulting her while she was detained at the Pawnee County Jail. Because the undisputed facts show that Ms. Pack was a "prisoner" within the meaning of the PLRA when she filed her original complaint seeking relief on Fourteenth Amendment claims arising from "prison life" and when she filed her First Amended Complaint re-asserting those claims, there is no issue for trial as to whether the PLRA's

---

[8] In each of her responses, Ms. Pack asserts that one movant, Mr. Jim, waived the PLRA exhaustion defense by stating in his answer that he was "uncertain if Plaintiff exhausted all her administrative remedies" and by not moving to dismiss her claims on exhaustion grounds. Dkt. 88 at 6; Dkt. 89 at 10; Dkt. 90 at 8. The Court disagrees. After *Jones*, a plaintiff need not plead facts about exhaustion, *see* 549 U.S. at 216, and Mr. Jim identified in his answer the defense that Ms. Pack "may have failed to exhaust her administrative remedies, *see* Dkt. 54 at 5. Further, Mr. Jim timely tested the affirmative defense of PLRA exhaustion by moving for summary judgment. *See Gray v. Sorrels*, 818 F. App'x 787, 791 (10th Cir. 2020) (citing circuit precedent for the proposition that because "the statutory exhaustion requirement of § 1997e(a) is mandatory" district courts do not err by "permitt[ing] the defendants to raise this exhaustion defense after the 12(b)(6) stage."); *Beaudry v. Corr. Corp. of Am.*, 331 F.3d 1164, 1167 n.5 (10th Cir. 2003) (*per curiam*) ("Nor are we persuaded that the district court erred in not finding that defendants had waived their exhaustion defense by waiting so late to raise it."). Mr. Jim did not waive PLRA exhaustion.

No. 24-cv-42

exhaustion requirement applies to Ms. Pack. *Nussle*, 534 U.S. at 524, 532; 42 U.S.C. § 1997e(a), (h).[9]

### 2

Second, Ms. Pack did not properly exhaust any administrative remedies for her federal claims. In each of her responses to the summary judgment motions, Ms. Pack concedes she did not comply with the PLRA's exhaustion requirement before filing suit in federal court. Dkt. 88 at 5; Dkt. 89 at 9; Dkt. 90 at 7. Her own testimony supports that concession. She admits she did not file any grievances or complaints or otherwise disclose to any jail staff, jail administration, or the sheriff, before filing this civil action, that Mr. Jim twice sexually assaulted her while she was detained at the Pawnee County Jail.

### 3

Third, while Ms. Pack contends administrative remedies were not available to her at the Pawnee County Jail, and that she therefore should be excused for failing to exhaust them, she did not cite specific facts showing that remedies were unavailable and did not show that a jury could decide this issue in her favor under governing law. *See May v. Segovia*, 929 F.3d 1223, 1234 (10th Cir. 2019) ("Although a defendant bears the burden of 'proving that the plaintiff did not [exhaust his] administrative remedies,' once the defendant has carried that burden, 'the onus falls on the plaintiff to show that remedies were unavailable to him.'"). As previously discussed, Movants asserted specific and properly supported facts showing that the Pawnee County Jail had a grievance process while Ms. Pack was detained there and provided inmates with multiple ways to submit grievances: through a computer-based kiosk

---

[9] In each of her responses, Ms. Pack asserts the PLRA is "inapplicable." Dkt. 88 at 5-9; Dkt. 89 at 7-9; Dkt. 90 at 7-8. But she concedes her claims arise from events that occurred while she was detained at the Pawnee County Jail and that she was detained at the Noble County Jail when she filed her original complaint. *Id.* The substance of her arguments show that she contests the availability of administrative remedies, not the applicability of the PLRA. The Court addresses her unavailability arguments in section III.B.3.

No. 24-cv-42

system, in writing, or verbally. And Ms. Pack admits she knew she could use the kiosk system to submit grievances about jail staff, jail conditions, and jail administration and that she was able to successfully navigate that system to submit a request for medical care. Nonetheless, Ms. Pack relies on some undisputed facts and tries to controvert others to support her contention that administrative remedies were not available. Neither the facts nor the law she relies upon show that there is a genuine issue for trial regarding the availability of administrative remedies.

a

First, Ms. Pack contends administrative remedies were unavailable because she was released from the Pawnee County Jail at the end of February 2023 and was detained at the Noble County Jail when she filed her original complaint. Dkt. 88 at 5-7; Dkt. 89 at 9-11; Dkt. 90 at 7-9. She argues that "as a practical matter," the Pawnee County Jail's administrative remedies were not available to her after her release, and that she could not have obtained any meaningful relief for Mr. Jim's misconduct at the Pawnee County Jail by exhausting administrative remedies at the Noble County Jail. *Id.* In support of these arguments, Ms. Pack cites two cases—*DeYonghe v. Ward*, 121 F. App'x 335 (10th Cir. 2005), and *Hilliard v. Ray*, 123 F. App'x 908 (10th Cir. 2005)—neither of which supports her position.

*Hilliard* contradicts it, explaining that availability of a jail's administrative procedures is determined "at the time of the alleged incidents" and an inmate's "failure to employ them in a timely manner does not excuse [the] failure to exhaust under § 1997e(a)." 123 F. App'x at 910. Ms. Pack testified that Mr. Jim assaulted her between February 8 and 21, 2023, and undisputed facts show she was detained at the Pawnee County Jail until February 28, 2023. Applying *Hilliard*, the Pawnee County Jail's administrative remedies were available to Ms. Pack at the time of the alleged incidents, the first of which occurred nearly three weeks before her release from the Pawnee County Jail and the last of which occurred roughly one week before she was

14

No. 24-cv-42

released, and her failure to timely employ them does not excuse her failure to exhaust them.

The Court cannot easily discern the principle Ms. Pack draws from *DeYonghe*. She states: "Contrary to the Defendant's position, the Tenth Circuit addresses the interplay between the PLRA and [the GTCA], as neither provide appropriate relief at the time Plaintiff filed her case." Dkt. 88 at 6; Dkt. 89 at 9-10; Dkt. 90 at 8. In the portion of *DeYonghe* that Ms. Pack appears to rely upon, the Tenth Circuit reasoned that because the inmate's federal claims against prison officials were not cognizable under the GTCA, the inmate "was not required to file a claim with the Office of Risk Management to exhaust his available administrative remedies" under the PLRA. 121 F. App'x at 338-39. *DeYonghe* thus addressed the steps the inmate must take to exhaust available remedies, not whether remedies were available to the inmate. Whatever the basis of Ms. Pack's reliance on this case, that reliance is misplaced.[10]

In short, neither Ms. Pack's release from the Pawnee County Jail at the end of February 2023 nor her subsequent detention at the Noble County

---

[10] Ms. Pack also cites a third case, *Miller v. Norris*, 247 F.3d 736 (8th Cir. 2001) to argue the unavailability of administrative remedies. Dkt. 88 at 6; Dkt. 89 at 10; Dkt. 90 at 8. Her reason for offering this case is opaque. She describes *Miller* as involving "similar facts" and states that the inmate in that case was excused from exhausting administrative remedies "because the Arkansas Department of Corrections had ample notice of his claims despite his failures to exhaust all possible remedies. The same should be true in the instant case." *Id.* The facts in *Miller* are not even remotely close to those here. The inmate in *Miller* alleged administrative remedies were not available to exhaust claims that arose in state prison because, after he was transferred to federal prison, state prison officials refused to respond to his request for grievance forms. 247 F.3d at 738. The Eighth Circuit concluded that the inmate's "allegations raise an inference that he was prevented from utilizing the [state] prison's administrative remedies," rendering them unavailable, but remanded the case to the district court without resolving "whether [the inmate], in fact, complied with § 1997e(a). *Id.* at 740. Like *Ross*, *Miller* recognizes that actions of prison officials may make administrative remedies unavailable. *Id.*; *Ross*, 578 U.S. at 644. But no facts in the summary-judgment record show, or permit this Court to draw a reasonable inference, that anyone at the Pawnee County Jail took any actions to prevent Ms. Pack from utilizing administrative remedies either while she was detained or after she was released.

No. 24-cv-42

Jail made the Pawnee County Jail's administrative remedies unavailable to her when it mattered, *i.e.*, when the alleged sexual assaults occurred between February 8 and 21, 2023, while detained at the Pawnee County Jail.

b

Second, Ms. Pack contends administrative remedies were unavailable because she feared retribution and retaliation. Dkt. 88 at 5, 7;[11] Dkt. 89 at 9, 11; Dkt. 90 at 7, 9-10. If jail officials "thwart inmates from taking advantage of a grievance process through . . . intimidation," that "renders the administrative process unavailable" and the PLRA's exhaustion requirement "poses no bar." *Ross*, 578 U.S. at 644; *see Tuckel*, 660 F.3d at 1252-53 (concluding "that when a prison official inhibits an inmate from utilizing an administrative process through threats or intimidation, that process can no longer be said to be 'available'"). An inmate alleging threats or intimidation made administrative remedies unavailable must show, "that the threat or intimidation actually did deter the plaintiff inmate from lodging a grievance or pursuing a particular part of the prison administrative process" and "that the threat or intimidation

---

[11] Tacked onto the end of her assertion that she feared retribution, Ms. Pack asserts in her response to Mr. Jim's motion that inmates often do not exhaust administrative remedies because "they are not told about that like Plaintiff" and she refers to Mr. Varnell's testimony that he did not hand out PREA materials to inmates or expressly tell them about the signs displaying the toll-free number for filing a PREA complaint. Dkt. 88 at 5. To the extent this too is an argument that administrative remedies were not available, it is not well developed and the Court rejects it. To be fair, it is not clear from the summary-judgment record whether calling the PREA hotline to report a sexual assault was part of the jail's administrative remedies that an inmate must exhaust or, instead, provided an inmate with an option to bypass the jail's administrative remedies by reporting a sexual assault to an outside agency. But even if reporting a sexual assault to the PREA hotline was part of the jail's administrative remedies, the portions of Mr. Varnell's testimony that Ms. Pack cites do not controvert other evidence in the summary-judgment record that signs displaying the PREA hotline were posted throughout the jail and informed inmates of the option to make a PREA complaint through the hotline. Moreover, Ms. Pack cites no legal authorities to support her apparent view that a jail's administrative remedies are unavailable or otherwise deficient if they do not require jail officials to educate inmates about their rights under PREA beyond posting that information in common areas of the jail.

16

No. 24-cv-42

would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance or pursuing the part of the prison administrative process that the inmate failed to exhaust." *Tuckel*, 660 F.3d at 1254. "Only threats that are sufficiently serious and retaliatory acts that are severe enough to deter a reasonable inmate will result in an administrative remedy becoming unavailable for PLRA purposes." *Id.* The law thus supports Ms. Pack's position that an inmate's reasonable fear of retribution and retaliation can make administrative remedies unavailable.

But no facts in the summary-judgment record support Ms. Pack's assertions that "fear of retribution deterred her from filing a grievance or pursing the administrative process," Dkt. 88 at 7; that she "was fearful to file grievances because of her fear of retribution," Dkt. 89 at 11; or that she "feared retaliation because complaints would be ignored," Dkt. 90 at 9.[12] To support these assertions, she appears to rely on the following facts that, she says, are "material" and "in dispute":

- "Plaintiff knew that if she filed a complaint it could be summarily dismissed." Dkt. 88 at 2 (citing Dkt. 88-2, pp. 117-19).

- "Using the kiosk to file any complaint was not anonymous." Dkt. 88 at 2 (citing Dkt. 88-3, pp. 32-33).

---

[12] Referencing her assertions that she feared retribution, retaliation, and being ignored, Ms. Pack asserts in each of her responses: "The Tenth Circuit determined that administrative remedies are not available in these situations" and cites *Hoover v. West*, 93 F. App'x 177 (10th Cir. 2004). Dkt. 88 at 7; Dkt. 89 at 11; Dkt. 90 at 9-10. *Hoover* though says nothing about these situations. There, an inmate argued the prison's administrative procedures were unavailable because (1) the grievance process could not be used to discipline staff and thus provided no meaningful remedy for his allegations and (2) prison officials' mistakes in processing his grievance prevented him from properly completing the grievance process. *Hoover*, 93 F. App'x at 180-82. The inmate also asserted the mistakes by prison officials that prevented him from exhausting administrative remedies equitably estopped them from seeking dismissal of his claims based on failure to comply with the PLRA's exhaustion requirement. *Id.* at 182.

No. 24-cv-42

- "Defendant's expert testifies that it is not uncommon for incarcerated persons who are victims of sexual assault to often complain after incarceration, as Plaintiff did herein." Dkt. 88 at 2-3 (citing Dkt. 88-4, pp. 75-78).

For the first fact, Ms. Pack points to her testimony of her belief that if she filed a complaint "the people that were working that shift would have access to all -- all the complaints, or anything you put in, they could just pull it up," that it would not "matter if [the complaint] was about admin or anything," "that the person working on shift would be able to look up the complaints at the moment," that "any guards could look it up," and that any complaint "could get dismissed or wiped out" because "they could just knock it down as read." Dkt. 88-2 at 3 [D. Pack Dep. 118:10-23]. She believed this was how the kiosk system at the Pawnee County Jail operated "[b]ecause there were some complaints about -- it was other inmates that would put in questions, and then it would get read and not done." *Id.* [D. Pack Dep. 118:24-119:2]. She admitted she was "not sure really what [the other inmates' complaints] pertained to," but "guessed" that one example was "like a hygiene, can you bring back toilet paper?" and "they wouldn't bring it back" and instead would "read [the request] and knock it down." *Id.* [D. Pack Dep. 119:3-6]. Even drawing all reasonable inferences in Ms. Pack's favor, the Court finds it reasonable to infer only that Ms. Pack believed it would be futile to file a grievance; not that she was fearful of filing one. More importantly, though, to avoid summary judgment, the nonmoving party cannot rely on conclusory opinions, allegations, speculations, beliefs, or suspicions. *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988). Rather, "she must present evidence of what she actually knows, perceived, or observed." *Exline-Johnson v. Rosser Props., LLC*, No. 22-CV-475-JDR-CDL, 2025 WL 1908969, at *2 (N.D. Okla. July 10, 2025) (unpublished); *see Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("To defeat a motion for summary judgment, evidence, *including testimony*, must be based on more than mere speculation, conjecture, or surmise." (emphasis added)). Ms. Pack's testimony demonstrates her

18

No. 24-cv-42

beliefs and speculations about what might have happened if she submitted a grievance through the kiosk. Her "mere speculation" does not controvert Movants' assertions of facts showing that administrative remedies were available through the kiosk system and through other means. *Bones*, 366 F.3d at 875.

Ms. Pack's second fact is immaterial. No one disputes that an inmate could not file an anonymous grievance through the kiosk system. But Ms. Pack cites no legal authority for her apparent proposition that administrative remedies are unavailable unless a jail provides inmates with a procedure for submitting anonymous grievances. Governing law instead supports the proposition that whether a jail permits anonymous grievances is left to the discretion of the officials who establish administrative remedies and the procedures for exhausting them. *See Jones*, 549 U.S. at 218 (explaining that applicable procedural rules "are defined not by the PLRA, but by the prison grievance process itself" and "it is the prison's requirements . . . that define the boundaries of proper exhaustion"); *Nussle*, 534 U.S. at 524 ("All available remedies must now be exhausted; those remedies need not meet federal standards, nor must they be plain, speedy, and effective." (cleaned up)).

Ms. Pack's third fact mischaracterizes the testimony it relies upon. The expert witness, Mr. Carter, said nothing about whether it is common for sexual assault victims to make post-incarceration complaints. Mr. Carter testified that "Ms. Pack stated she didn't contact, or didn't tell the facility *because of her lack of trust for the facility*. But then after getting out - - and sometimes inmates will say - - true or not, but they will say that they were afraid of retaliation." Dkt. 88-4 at 4 [Carter Dep. 77:5-10] (emphasis added). After Ms. Pack's counsel repeatedly stated through his questions to Mr. Carter that Ms. Pack had, in fact, testified "she was fearful of retaliation," Mr. Carter testified that his review of the evidence showed Ms. Pack "stated she did not submit documentation or letters *due to a lack of trust in the facility,*" but Mr. Carter further testified that if Ms. Pack had stated she feared retaliation, "[t]hat's

19

*common to be said. True or not, it's common what's to be said.*" *Id.* at 4-5 [Carter Dep. 77:13-78:15] (emphases added). Mr. Carter's testimony thus shows that regardless of inmates' reasons for waiting until after release from custody to complain about jail staff or jail conditions, it is not uncommon for former inmates to say they feared retaliation. Regardless, even accepting Ms. Pack's characterization of Mr. Carter's testimony, Ms. Pack does not point to any part of her own testimony (as opposed to her counsel's statements about Ms. Pack's testimony) or any other evidence in the summary-judgment record to support that Ms. Pack did not file a grievance because she feared retaliation or retribution. Rather, her most relevant testimony, as just discussed, speaks of her fear of futility that was based on her speculation that if she filed a complaint, it would be dismissed or ignored. Further, she cites no specific facts that would create a genuine issue for trial on whether any subjective fear she may have had would have been objectively reasonable. *See Tuckel*, 660 F.3d at 1254 (explaining that the second showing an inmate must make to avoid summary judgment on the affirmative defense of PLRA exhaustion based on alleged threats or intimidation "is an objective one, requiring the district court to consider the context of the alleged threat or intimidation"). Considering context, the Court finds no evidence to support a reasonable inference that any fear Ms. Pack may have had would have been objectively reasonable. Ms. Pack testified that she and Mr. Jim exchanged letters that, *inter alia*, discussed the topic of the two having a relationship, that she liked the attention (and contraband) she received from Mr. Jim, and that Mr. Jim (despite allegedly having forced her to engage in two sexual encounters) never threatened her or acted violently toward her while she was detained at the Pawnee County Jail. Nor does she cite any evidence that anyone else at the Pawnee County Jail threatened her with retaliation or took any other action to deter her (or that would deter an inmate of reasonable firmness and fortitude) from filing a formal grievance or otherwise reporting Mr. Jim's assaults. Notably, Ms. Pack testified that while she was initially housed in a holding cell, she had no fear

No. 24-cv-42

of verbally reporting concerns to "Jessica" about Mr. Jim "being weird," looking at her "weirdly," and making her "uncomfortable." Dkt. 81-6 at 39 [D. Pack Dep. 76:11-25]. A reasonable inference to be drawn from her initial firmness and fortitude in reporting concerns when she admits Mr. Jim did not touch her in the holding cell, is that she would not fear reporting concerns to someone at the jail when he thereafter initiated sexual contact with her on two occasions and without her consent. In sum, even if Ms. Pack merely failed to direct this Court to evidence in the record showing she had a subjective fear of retaliation and retribution, there is no genuine issue for trial because no jury could find from the evidence in the summary-judgment record or through reasonable inferences drawn therefrom that any fear she may have had was objectively reasonable and thus made administrative remedies unavailable.

c

Third, and threaded throughout her arguments, Ms. Pack contends (1) it would have been futile to exhaust administrative remedies because her complaints would be ignored and Mr. Jim "had physical access and control over all aspects of Plaintiff's environment making administrative remedies useless, even without explicit threats"; and (2) the PLRA's exhaustion requirement should not apply to victims of sexual assault, particularly given the "inherent coercive power of dynamic between a detention officer and inmate." Dkt. 88 at 5-7; Dkt. 89 at 9-12; Dkt. 90 at 7-11. As just discussed, Ms. Pack's testimony in support of her "fear" of being ignored if she filed a complaint is based entirely on her speculative beliefs that a sexual assault complaint could be viewed by any detention officer and would be "dismissed or wiped out" like a routine request for personal hygiene products. She cannot rely on her speculation about how the kiosk system might have worked for other inmates to controvert the facts cited by Movants showing that Pawnee County Jail had a grievance process and provided inmates multiple means to submit grievances about jail staff, that that she knew the kiosk system could be used to

No. 24-cv-42

submit grievances or complaints about jail staff, and that she knew how to use the kiosk system. Nor can she rely on perceived futility to show that administrative remedies were unavailable or that she should be excused from exhausting them. *See Booth*, 532 U.S. at 741 n.6 (explaining that courts will "not read futility or other exceptions into statutory exhaustion requirements"); *United States v. Contreras-Cabrera*, 766 F. App'x 674, 676 (10th Cir. 2019) (noting that "futility does not excuse a failure to exhaust when administrative exhaustion is required by a statute").

Likewise, Ms. Pack cannot resist summary judgment on the affirmative defense of PLRA exhaustion by asserting a policy argument against applying the exhaustion requirement to victims of sexual assault. *See Ross*, 578 U.S. at 638 ("Statutory text and history alike foreclose the Fourth Circuit's adoption of a 'special circumstances' exception to [the PLRA's] mandate."); *id.* at 639 (noting that the PLRA's "mandatory language means a court may not excuse a failure to exhaust even to take [special] circumstances into account"); *Thompson v. Coulter*, 680 F. App'x 707, 711 (10th Cir. 2017) (applying PLRA's exhaustion requirement when inmate raised federal claims based on sexual assault by prison guard). Further, even if this Court could consider "special circumstances" (a proposition *Ross* clearly forecloses), as Mr. Jim states, excusing the failure to comply with the PLRA's exhaustion requirement based on "[a] generalized power differential, which is present in every custodial relationship" would effectively nullify *Nussle*'s holding that the PLRA applies to "all inmate suits about prison life." Dkt. 91 at 8.

d

For the reasons stated, there is no genuine issue for trial regarding whether the Pawnee County Jail's administrative remedies were available to Ms. Pack.

No. 24-cv-42

## C

The undisputed facts in the summary-judgment record show that Movants are entitled to judgment as a matter of law on the affirmative defense of PLRA exhaustion. The Court therefore grants Movants' motions for summary judgment and dismisses all federal claims in the First Amended Complaint asserted against Mr. Jim, Mr. Varnell, and Sheriff Price.

## IV

Ms. Pack's only remaining federal claim is the Fourteenth Amendment deliberate indifference claim she asserts against Ms. Kelly. In support of this claim, Ms. Pack alleges Ms. Kelly was the jail administrator during the time relevant to Ms. Pack's claims. Dkt. 22 ¶ 6. She further alleges Mr. Jim was Ms. Kelly's brother or brother-in-law and Ms. Kelly knew Mr. Jim had "violent propensities" but helped him gain employment at the jail and permitted him to gain access to Ms. Pack. *Id.* at ¶¶ 6, 9. Ms. Pack served process on Ms. Kelly in September 2024, but Ms. Kelly did not file an answer, has not otherwise appeared in this matter, and has not moved for summary judgment. Dkts. 1, 22, 26.

For the reasons previously discussed, Ms. Pack's failure to comply with the PLRA's exhaustion requirement bars her federal claim against Ms. Kelly and, for the reasons discussed next, the Court finds it appropriate to grant summary judgment in favor of Ms. Kelly on the affirmative defense of PLRA exhaustion even though Ms. Kelly has neither appeared nor moved for summary judgment.

## A

"After giving notice and a reasonable time to respond, the court may," "grant summary judgment for a nonmovant" or "grant summary judgment sua sponte." Fed. R. Civ. P. 56(f)(1), (f)(3). Summary judgment in favor of a nonmovant may be granted even without notice to the losing party, so long as the losing party is not prejudiced by the lack of notice. *See Zinna v. Cook*, 428

23

No. 24-cv-42

F. App'x 838, 841 & n.3 (10th Cir. 2011) (noting that "[m]any courts have countenanced the sua sponte grant of summary judgment to a non-moving defendant, provided the basis for the ruling in favor of the moving defendants applies as well to the non-movant and the plaintiff was not prejudiced by being unaware of the need to make his case against all" and noting this practice was "essentially codified" in Rule 56(f) through 2010 amendments); *Ward v. Utah*, 398 F.3d 1239, 1245 (10th Cir. 2005) ("[A] sua sponte order of summary judgment may be appropriate if 'the losing party was on notice that she had to come forward with all of her evidence.'"(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986))). "A party is procedurally prejudiced if it is surprised by the district court's action and that surprise results in the party's failure to present evidence in support of its position." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1170-71 (10th Cir. 2010) (quoting *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 139 (2d Cir. 2000)). And "[w]hen a district court's sua sponte determination is based on issues identical to those raised by a moving party, the risk of prejudice is significantly lowered because 'the judge already is engaged in determining whether a genuine issue of material fact exists and the parties have been given an opportunity to present evidence designed either to support or refute the request for the entry of judgment.'" (quoting 10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and Procedure* § 2720 (3d ed. 1998)).

### B

For two reasons, the Court finds it appropriate to sua sponte grant summary judgment in favor of Ms. Kelly on the affirmative defense of PLRA exhaustion.

First, Ms. Pack's federal claim against Ms. Kelly, like her claims against Movants, is premised on events that allegedly occurred while Ms. Pack was detained in the Pawnee County Jail and like her claims against Movants, is barred by Ms. Pack's failure to exhaust available administrative remedies. Thus, Ms. Kelly is entitled to judgment as a matter of law on the

No. 24-cv-42

affirmative defense of PLRA exhaustion for the same reasons as Movants. *Zinna*, 428 F. App'x at 841.

Second, Ms. Pack will not be procedurally prejudiced by the sua sponte grant of summary judgment because she had ample notice (1) that the factual basis for all claims she asserts against Ms. Kelly is questionable and (2) that her federal claims against all defendants might be barred by her failure to exhaust administrative remedies.

Ms. Pack had notice nearly two years ago that the factual support for her claims against Ms. Kelly was suspect. In moving to dismiss the First Amended Complaint, Mr. Varnell's counsel stated that he advised Ms. Pack's counsel via email, on or before September 9, 2024, that Mr. Varnell was "not aware of anyone [named Jessica Kelly] ever working for the Sheriff's Office or the jail during his time as Sheriff, which would include the time period giving rise to [Ms. Pack's] claims." Dkt. 29 at 9 n.2. In its July 1, 2025 Order granting in part and denying in part Mr. Varnell's dismissal motion, this Court noted that Ms. Kelly had been served and had not appeared and that Mr. Varnell did not recognize Ms. Kelly as a former jail administrator or jail employee. Dkt. 46 at 5 n.3. The Court further noted that, as of July 1, 2025, Ms. Pack's counsel had not filed a notice of party name correction, sought leave to substitute a different party in place of Ms. Kelly, or otherwise sought leave to amend the First Amended Complaint. *Id.*

Inexplicably, the inaction of Ms. Pack's counsel continues even after the close of discovery and in the face of obvious evidence in the summary-judgment record that Ms. Kelly has no apparent connection with Ms. Pack's claims. In her February 2026 deposition, Ms. Pack testified that when she was in the holding cell shortly after she arrived at the jail she "said something" to "Jessica" about Mr. Jim "being weird" and making Ms. Pack uncomfortable when "he would stand over [her] and look weirdly at [her]." Dkt. 81-6 at 39 [D. Pack Dep. 76:11-25]. Beyond Ms. Pack's mention of her verbal report to

No. 24-cv-42

"Jessica," undisputed evidence in the summary-judgment record drives home the point made by Mr. Varnell's counsel nearly two years ago—no defendant affiliated with the Pawnee County Jail during the time relevant to Ms. Pack's claims is aware of Ms. Kelly having been employed as a jail administrator for the Pawnee County Jail while Ms. Pack was detained at the jail. In his April 2026 deposition, Mr. Varnell identified Ms. Trammel as the jail administrator during the time relevant to Ms. Pack's claims. Dkt. 81-1 at 4, 18 [Varnell Dep. 7:4-10, 36:1-2]. Mr. Jim, who also was deposed in April 2026, identified several jail administrators he worked for (none of whom was Ms. Kelly but one of whom was Ms. Trammel), denied being related to any jail administrators he worked for, and testified he did not know anyone named Jessica Kelly. Dkt. 81-4 at 4-5, 9 [Jim Dep. 25:1-26:25, 38:2-19]. Given the evidence developed through discovery, it appears clear that Ms. Pack has no factual basis to assert any claims against Ms. Kelly based on the alleged incidents that occurred at the Pawnee County Jail in February 2023. To date, however, Ms. Pack has not moved to dismiss her claims against Ms. Kelly, has not moved for default judgment against her based on her failure to appear, has not moved to substitute Ms. Trammel in place of Ms. Kelly, and has not otherwise explained to this Court why, in light of evidence developed through discovery, she should be permitted to proceed on her claims against Ms. Kelly. Thus, it should not surprise Ms. Pack that this Court might extend to Ms. Kelly the benefit of an affirmative defense raised by Movants that applies equally to Ms. Kelly, even though Ms. Kelly has not appeared and has not moved for summary judgment.

Further, Movants' summary judgment motions provided Ms. Pack with sufficient notice that PLRA exhaustion was an issue and a reasonable opportunity to come forward with specific evidence to counter Movants' evidence showing that she did not exhaust available administrative remedies. Nothing in the record suggests Ms. Pack would have made a stronger showing to resist summary judgment on the affirmative defense of PLRA exhaustion

No. 24-cv-42

had she received additional notice from this Court that it might extend the benefit of summary judgment to Ms. Kelly if the Court found the summary-judgment record supported Movants' position that they were entitled to judgment as a matter of law.

Under these circumstances, the Court thus finds it appropriate to sua sponte grant summary judgment in Ms. Kelly's favor and dismisses the federal claim against Ms. Kelly in the First Amended Complaint.

## V

Because undisputed facts in the summary-judgment record show that Ms. Pack was a prisoner when she filed this civil action and that she did not exhaust available administrative remedies before filing suit, all defendants are entitled to judgment as a matter of law on Ms. Pack's federal claims based on the affirmative defense of PLRA exhaustion. The Court therefore grants Movants' motions for summary judgment under Rule 56(a); grants summary judgment to Ms. Kelly under Rule 56(f); and dismisses the First Amended Complaint, without prejudice,[13] on all federal claims against all defendants.

Given the dismissal of all federal claims, the Court declines to exercise supplemental jurisdiction over Ms. Pack's state-law claims and dismisses the First Amended Complaint, without prejudice, on all state-law claims against Mr. Jim and Ms. Kelly.[14]

---

[13] "Ordinarily, a dismissal based on a failure to exhaust administrative remedies should be *without* prejudice." *Gallagher v. Shelton*, 587 F.3d 1063, 1068 (10th Cir. 2009) (emphasis in original).

[14] The Court acknowledges that Ms. Pack brought this action, including her state-law claims, more than two years ago and that dismissal of Ms. Pack's state-law claims may seem inconvenient and unfair. *See Foxfield Villa Assoc's, LLC v. Robben*, 967 F.3d 1082, 1102 (10th Cir. 2020 (discussing factors to consider before declining to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(3)). But Ms. Pack asserts only two state-law claims: one against Ms. Kelly, a defendant with no apparent connection to Mr. Jim's alleged misconduct at the Pawnee County Jail, and two against Mr. Jim, who has asserted that Ms. Pack did not comply with the GTCA and state-law requirements for exhausting available

*(footnote continues)*

No. 24-cv-42

Lastly, based on the dismissal of all claims, the Court dismisses as moot the pending motions to exclude the report and testimony of Ms. Pack's expert witness, strikes all pending pretrial deadlines, and strikes the pretrial conference and jury trial.

## VI

IT IS ORDERED that Defendant Shawn Price's Motion for Summary Judgment [Dkt. 81], Defendant Darrin Varnell's Motion for Summary Judgment [Dkt. 82], and Defendant Jeremiah Jim's Motion for Summary Judgment [Dkt. 84] are granted under Federal Rule of Civil Procedure 56(a); and summary judgment is granted in favor of Defendant Jessica Kelly, sua sponte, under Federal Rule of Civil Procedure 56(f).

IT IS FURTHER ORDERED that all federal claims asserted against all defendants in the First Amended Complaint are dismissed without prejudice for failure to exhaust available administrative remedies as required by 42 U.S.C. § 1997e(a); and all state law claims are dismissed without prejudice because the Court declines to exercise supplemental jurisdiction over those claims under 28 U.S.C. § 1367(c)(3).

IT IS FURTHER ORDERED that Defendant Shawn Price's Motion to Exclude the Report and Anticipated Testimony of Expert Witness Reginald Hines [Dkt. 80] and Defendant Darrin Varnell's Motion to Exclude

---

administrative remedies. Dkt. 84 at 26-30. Whether Ms. Pack complied with the GTCA and state-law exhaustion requirements before asserting common law and per se negligence claims against a former county detention officer who is sued only in his individual capacity and who allegedly sexually assaulted her while she was detained in county jail, and thus may have been acting outside the scope of his employment, raises important questions of state law that are better resolved in state court when no federal claims remain for this Court to consider. *See Foxfield Villa Assoc's, LLC*, 967 F.3d at 1103 ("[A] district court should normally dismiss supplemental state law claims after all federal claims have been dismissed, particularly when the federal claims are dismissed before trial." (quoting *United States v. Botefuhr*, 309 F.3d 1263, 1273 (10th Cir. 2002)).

No. 24-cv-42

the Report and Anticipated Testimony of Expert Witness Reginald Hines [Dkt. 83] are dismissed as moot.

IT IS FURTHER ORDERED that all pending pretrial deadlines, the pretrial conference set for September 18, 2026, and the jury trial set for October 13, 2026, are hereby stricken; and a separate judgment shall be entered in this matter.

DATED this 3rd day of August 2026.

JOHN D. RUSSELL
*United States District Judge*